# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| NEW YORK LIFE INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. _____ |
| PAUL M. ARAGON, JOSEPH E. FITZPATRICK, and DANIEL FITZPATRICK, | § § § § | |
| Defendants. | § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT IN INTERPLEADER

TO THE HONORABLE COURT:

Pursuant to Rule 1-022 NMRA, NEW YORK LIFE INSURANCE COMPANY, (the "Company"), by and through its undersigned counsel, files this its Original Complaint in Interpleader and complains of Defendants PAUL M. ARAGON, JOSEPH E. FITZPATRICK, III, and DANIEL FITZPATRICK, and in support thereof would respectfully show as follow:

### A. PARTIES

1.      The Company is a mutual insurance company organized and existing under the laws of the State of New York with its principal place of business at 51 Madison Avenue, New York, New York. The Company is duly authorized to do business in the State of New Mexico.

2.      Upon information and belief, Joseph E. Fitzpatrick (the "Insured"), deceased, was a resident of New Mexico.

3.      Upon information and belief, Paul M. Aragon ("Paul Aragon"), the Insured's partner, is an adult citizen of New Mexico, is incarcerated and remains at the Torrance County Detention Facility in New Mexico.

4.      Upon information and belief, Joseph E. Fitzpatrick, III ("Joseph Fitzpatrick"), the Insured's son, is an adult citizen of Florida, residing at 3407 70th Court East, Palmettos, Florida.

5.      Upon information and belief, Daniel Fitzpatrick ("Daniel Fitzpatrick"), the Insured's son, is an adult citizen of Indiana residing at 925 Danbury Drive, Kokomo, Indiana.

6.      Upon information and belief, there has been no proceeding commenced to administer the Estate of the Insured.

## B.  JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1335 because two or more of the adverse claimants are of diverse citizenship from one another and the amount in controversy exceeds $500.00.  *See State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 530-31 (1967) (only minimal diversity required in statutory interpleader actions).

8.      The Court has personal jurisdiction over each of the claimants pursuant to Fed. R. Civ. P. 4(k)(1)(C) because 28 U.S.C. § 2361 provides for nationwide service of process in federal statutory interpleader actions.

9.      Venue is proper in this federal district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## C.  CAUSE OF ACTION IN INTERPLEADER

10.      On or about January 28, 2018, the Company issued life insurance certificate A10318872 (the "Policy") to the Insured, which provided coverage on the life of the Insured.

11.      By Member Enrollment Form dated January 10, 2019, the Insured designated Paul Aragon as sole primary beneficiary to the Policy death benefit proceeds and did not designate a contingent beneficiary. *A true and correct copy of the Policy is attached hereto as **Exhibit A.***

12.     Upon information and belief, the Insured died on December 8, 2021. The Insured's cause of death was listed as a "homicide, negligent manslaughter- other" per the Torrance County Sheriff's Office Incident Report dated December 8, 2021 (the "Incident Report"). *A true and correct copy of the December 8, 2021 Incident Report is attached hereto as **Exhibit B.***

13.     As a result of the death of the Insured, Policy death benefit proceeds in the amount of $5,000.00 became payable to a beneficiary or beneficiaries (the "Death Benefit"), and liability is conceded to that effect.

14.     After the Insured's death, Joseph Fitzpatrick made a claim to the Death Benefit.

15.     By letter dated February 25, 2022, the Company updated Joseph Fitzpatrick on his pending claim advising him that it was in receipt of the Incident Report. *A true and correct copy of the February 25, 2022 letter is attached hereto as **Exhibit C.***

16.     Thereafter, Paul Aragon also made a claim to the Death Benefit.

17.     By letter dated May 2, 2022, the Company acknowledged receipt of Paul Aragon's claim. *A true and correct copy of the May 2, 2022 letter to Paul is attached hereto as **Exhibit D.***

18.     A criminal action was thereafter initiated in the State of New Mexico entitled *State of New Mexico v. Paul Matthew Aragon,* Case No. D-722-CE-20210072 (the "Criminal Action") in which Paul Aragon was charged with the murder of the Insured in the First Degree and felony receipt, transportation or possession of a firearm or destructive device by certain persons. *A true and correct copy of the docket for the Criminal Action is attached hereto as **Exhibit E.***

19.     Under New Mexico's slayer statute which prohibits a wrongdoer from profiting from his or her crime, if Paul Aragon is shown to have feloniously and/or intentionally caused the death of the Insured, then he would forfeit any right to the Death Benefit. See N.M. Stat.Ann. §452-803(B) and N.M. Stat. Ann. §45-2-803(C)(1)(a).

20.     If Paul Aragon, as the beneficiary of record, is found to have forfeited his right to the Death Benefit, then it would be as if he predeceased the Insured, resulting in there being no beneficiary of record for the Insured's life insurance coverage under the Policy.

21.     Pursuant to the Policy's Beneficiary rules, if no beneficiary is designated or no beneficiary is living at the time of the Insured's death, payment will be made at the Company's option to the Estate of the Insured or the Insured's surviving relatives in the following order of survival: spouse or domestic partner as defined by law, as applicable; children equally; parents equally; or brothers and sisters equally. *A true and correct copy of the Policy's Beneficiary Rules are attached hereto as **Exhibit A, page 8.***

22.     Accordingly, if Paul Aragon is found to have forfeited his right to receive the Death Benefit, Joseph Fitzpatrick and Daniel Fitzpatrick would be entitled to receive the Death Benefit.

23.     There have not been any other claims for the Death Benefit, nor has the Company been made aware of any probate proceedings for the Insured.

24.     Under the circumstances, the Company cannot determine factually or legally who is entitled to the Death Benefit. By reason of the actual or potential claims of the Defendants, the Company is or may be exposed to multiple liability.

25.     The Company is ready, willing and able to pay the Death Benefit, plus claim interest, if any, in accordance with the terms of the Policy to whomever this Court shall designate.

26.     As a mere stakeholder, the Company has no interest (except to recover its attorneys' fees and cost of this action) in the Death Benefit and respectfully requests that this Court determine to whom the Death Benefit should be paid.

27.     The Company accordingly will deposit into the Court the Death Benefit, plus claim interest, if any, for disbursement in accordance with the judgment of this Court.

28.    The Company has not brought this Complaint in Interpleader at the request of any of the Defendants. There is no fraud or collusion between the Company and any of the Defendants.

29.    The Company brings this Complaint of its own free will and to avoid being vexed and harassed by conflicting and multiple claims.

### D.  ATTORNEYS' FEES

30.    Under New Mexico law, the Company is entitled to recover its reasonable and necessary attorneys' fees and costs of court in bringing this interpleader action.  *See State Farm Life Tower Life Ins. Co. v. Tucker*, 557 F. Supp. 2d 1287, 1289–90 (D.N.M. 2007) (*citing Transamerica Premier Ins. Co. v. Growney*, No. 94–3396, 1995 WL 675368, at *1, 1995 U.S.App. LEXIS 31836, at *3 (10th Cir. Nov. 13, 1995).

### E.  PRAYER FOR RELIEF

For these reasons, Plaintiff NEW YORK LIFE INSURANCE COMPANY, prays that the Court enter judgment as follows:

(a) requiring the Defendants to answer this Complaint in Interpleader and litigate their claims between themselves for the Death Benefit;

(b) enjoining the Defendants from instituting or prosecuting any proceeding in any state or United States court affecting the Death Benefit and/or the Policy;

(c) requiring that the Defendants settle and adjust between themselves, or upon their failure to do so, this Court settle and adjust the claims and determine to whom the Death Benefit should be paid;

(d) permitting the Company to deposit the amount of the Death Benefit, plus applicable claim interest, if any, into the Court or as this Court otherwise directs to be subject to the order of this Court and to be paid out as this Court shall direct;

(e) discharging the Company from any and all further liability to Defendants relating in any way to the Policy and/or the Death Benefit upon payment of the Death Benefit into the Registry of this Court or as otherwise directed by this Court;

(f) awarding the Company its attorneys' fees and costs in their entirety; and

(g) awarding the Company any other and further relief that this Court deems just and proper.

Respectfully submitted,

KEMP SMITH LLP
P.O. Box 2800
El Paso, Texas 79999-2800
915.533.4424
915.546.5360 (Facsimile)

By: _____

**RICHARD BONNER**
NM State Bar No. 12158
Richard.Bonner@kempsmith.com

# EXHIBIT A

THIS INSURANCE

---

DOCUMENT HAS BEEN PREPARED

---

EXCLUSIVELY FOR:

Joseph Fitzpatrick

Date of Birth:        04/10/1948
Sex:                  Male
Insurance Date:       02/04/2019
Amount of Insurance:  $5,000

THE FOLLOWING PAGES
CONSTITUTE THE CERTIFICATE.
*Please review and keep for your records.*





**New York Life Insurance Company**
51 Madison Avenue, New York, NY 10010

# CERTIFICATE

### AARP PERMANENT LIFE
### (GROUP PERMANENT LIFE INSURANCE)
### (Paid Up At *Age* 95)

**Please note: Defined terms are in *italics* and can be found on the definitions page[s].**

| | |
|---|---|
| **POLICYHOLDER** | TRUSTEE OF THE AARP LIFE INSURANCE TRUST |
| **POLICY NUMBER** | AA-75 (the "*policy*") |

*We* certify that the *insured* becomes insured on 02/04/2019 if the initial *premium* is paid no later than 31 days after 02/04/2019. Insurance is subject to: (a) the Suicide limitation; (b) the terms and conditions of the *policy;* and (c) *our* underwriting requirements.

### INDIVIDUAL SCHEDULE OF BENEFITS

| | |
|---|---|
| **CERTIFICATE NUMBER** | A10318872 |
| **INSURED MEMBER** | Joseph Fitzpatrick |
| **ADDRESS** | 242 Iceplant Rd<br>Estancia, NM 87016 |
| **DATE OF BIRTH** | ▉▉▉▉▉▉ |
| **AGE AT ISSUE** | 70 |
| **SEX** | Male |
| **INSURANCE DATE** | 02/04/2019 |
| **AMOUNT OF INSURANCE** | $5,000 |
| **AT ATTAINED AGE 85** | $6,500 |
| **PREMIUM** | $36.51 monthly – Automatic *Premium* Payment(APP) |
| **CLASS OF RISK** | Non Smoker |
| **BENEFICIARY** | First Beneficiary - Paul M Aragom 100% |
| **RIGHT TO EXAMINE THE CERTIFICATE FOR 30 DAYS** | The *owner* will have 30 days from the date of receipt to examine the Certificate. If the *owner* does not wish to keep the Certificate, it must be surrendered to *us*, or to the agent through whom it was purchased if applicable, within this period. Upon such surrender, *we* will return any *premium* paid and insurance will be void from the start. |

This Certificate replaces all Certificates previously issued under the above Certificate Number.

Secretary

President

AA-75/Cert

GMR-FACE, GMR-C-SCH

10/01/2017, PL10

## SCHEDULE

### PREMIUM

The *premiums* are payable to *age* 95 and are guaranteed not to change. Once the required *premiums* are paid, insurance becomes fully paid up. No further *premiums* are required to remain insured under the *policy*.

If the *owner* changes the payment method or frequency the *premium* will change according to the rules on the *insurance date*, as described in the *policy*.

## TABLE OF VALUES

### AGE AT ISSUE: 70

### SEX: Male

| At the Anniversary of the *Insurance Date* | *Cash Value* Per Unit | Length of Extended Term Insurance Available | |
|---|---|---|---|
| | | Years | Days |
| 1 | $0.00 | 0 | 0 |
| 2 | 26.28 | 1 | 187 |
| 3 | 70.59 | 3 | 149 |
| 4 | 115.60 | 4 | 297 |
| 5 | 161.33 | 5 | 322 |
| 6 | 207.84 | 6 | 256 |
| 7 | 255.27 | 7 | 120 |
| 8 | 303.74 | 7 | 228 |
| 9 | 353.43 | 7 | 247 |
| 10 | 404.47 | 7 | 241 |
| 11 | 457.09 | 7 | 215 |
| 12 | 511.62 | 7 | 173 |
| 13 | 568.60 | 7 | 121 |
| 14 | 628.72 | 7 | 60 |
| 15 | 693.01 | 6 | 360 |
| 16 | 734.07 | 6 | 303 |
| 17 | 773.88 | 6 | 249 |
| 18 | 812.38 | 6 | 204 |
| 19 | 849.77 | 6 | 170 |
| 20 | 886.63 | 6 | 153 |

The Amount of Insurance for each unit in this table is $1,000; it becomes $1,300 at attained *age* 85.

This table assumes that the required *premiums* have been paid to the Anniversary shown and an Accelerated Benefit has not been paid and a loan is not outstanding. *Cash values* and Extended Term Insurance amounts at times not shown or where an Accelerated Benefit has been paid or where a loan is outstanding will be furnished upon request. At *age* 105, *we* will send a notice to the *owner* stating that the cash value equals the Amount of Insurance.

A $12 annual fee is added to monthly non-Automatic Premium Payments, translating to an additional $1 per monthly payment. Automatic Premium Payments (APP) are monthly automatic deductions from an authorized bank account.

The *premiums* are based on the billing mode and method on the *insurance date*. Any change to the billing mode or method may cause a change in the *premium*.

**TABLE OF CONTENTS**

IMPORTANT NOTICE.................................................................................................................6-7
    Certificate
    Conformity with State Laws and/or Regulations
    Continuation of Coverage
    Deferral of Payment
    Duty to Cooperate
    Examination
    Incontestability
    Misstatements
    Policy Changes
    Validity
    Other Details

GROUP PERMANENT LIFE INSURANCE.........................................................................7-9
    Accelerated Benefit
    Death Benefit
    What Benefit is Payable
    Beneficiary
    Request Procedure
    Transfer of Ownership
    Loan Benefit
    Surrender Benefit

WHEN INSURANCE ENDS.............................................................................................9

WAIVER OF PREMIUM BENEFIT
    FOR NURSING HOME CONFINEMENT.................................................................10

NON-FORFEITURE VALUES.....................................................................................10-11
    Options When Insurance Ends
    Surrender for Cash
    Extended Term Insurance

DEFINITIONS.............................................................................................................11-12

AA-75

GMR-TABLE

## IMPORTANT NOTICE

**CERTIFICATE**

This Certificate is a summary of the provisions of the *policy*. It should be kept in a safe place. It is not a contract of insurance. Any conflict between the terms of the Certificate and the *policy* will be decided in favor of the *policy*. A copy of the *policy* is available at the Policyholder's office for inspection at any time during business hours. The *owner* should contact *us* with questions regarding the insurance.

**CONFORMITY WITH STATE LAWS AND/OR REGULATIONS**

Any provision of the *policy* which is in conflict with any law and/or regulation of its Contract State or any applicable extraterritorial law and/or regulation of any other state in which the *insured* and/or *owner* is a resident on the *Insurance Date*, is amended to conform to the minimum requirements of such law and/or regulation.

**CONTINUATION OF COVERAGE**

Except as stated in the When Insurance Ends section, once insurance becomes effective coverage will continue even if: (a) the *policy* with AARP ends; (b) the *insured* ceases to be an AARP member, or (c) the *policy* is amended to end the eligible class of which the *insured* is a member.

**DEFERRAL OF PAYMENT**

*Our* general practice is to pay benefits as soon as reasonably possible. However, *we* may defer the payment of the Surrender and/or Loan Benefit for up to six months after receipt of a request for payment. *We* will pay interest, at the rate required by state law, compounded annually on the amount of any benefit so deferred. Interest will be paid from the date of deferral until the date the benefit is paid.

**DUTY TO COOPERATE**

The *owner, insured* and Beneficiary(ies) each have a duty to cooperate with *us* in the underwriting for the insurance, the investigation of any claim for benefits, and any other inquiry *we* make in connection with the insurance. This duty to cooperate includes, but is not limited to, providing signed authorizations, in the form *we* request and without time limitation, for the release of medical records or other information concerning answers to questions on the enrollment form.

**EXAMINATION**

*We*, at *our* expense, have the right to examine the medical records of the *insured* and other information as to which we have been given authorization in order to determine the cause of death and assess insurability.

**INCONTESTABILITY**

Except for nonpayment of *premiums, we* cannot contest the validity of the insurance or reinstated insurance after it has been in force for two years during the *insured*'s lifetime from: (1) the *insurance date*, and (2) the date the insurance is reinstated, if applicable. To contest, *we* will only rely upon statements signed by the *owner* in applying for such insurance. A copy of all statements must be furnished to the *owner* or to the beneficiary. Such statements are representations, not warranties. If this Certificate is issued from exercising the "Option to Exchange" provision of another certificate issued by *us* this provision will be measured from the original certificate's *insurance date*, or reinstatement date, that is being exchanged.

**MISSTATEMENTS**

If relevant statements of *age at issue* or Sex were not accurate for any person: (a) a fair adjustment of remittances and/or insurance will be made; and (b) based upon the facts, *we* will decide whether, and what, insurance is valid under the *policy*. If the *age at issue* or Sex for any person is incorrect but such person would have qualified as an *eligible member* on the *insurance date* with the correct information, the amount payable under the *policy* will be the amount the *premiums* would have purchased at the correct *age at issue* or Sex.

AA-75

GMR-C-NOTICE

**POLICY CHANGES**

The *policy* can be changed: (a) at any time by written agreement between *us* and the Policyholder; and (b) without the consent of any other person. No agent is authorized to change the *policy* or this Certificate or waive any of their provisions.

**VALIDITY**

Any attempt to defraud *us* when obtaining this insurance or making a claim may invalidate this Certificate and/or result in a loss of coverage.

**OTHER DETAILS**

On all stated days and dates, insurance begins at 12:01 A.M. and insurance ends at midnight as applicable to the *insured.*

AA-75

GMR-C-NOTICE

---

# GROUP PERMANENT LIFE INSURANCE

*We* will pay a benefit for the: (a) Terminal Illness; (b) death; or (c) Loan and/or Surrender Benefit; in accordance with all of the following:

**ACCELERATED BENEFIT**

The Accelerated Benefit is available if the *insured*: has a Terminal Illness. "Terminal Illness" is a medical condition where the patient has a life expectancy of 24 months or less, if such condition does not result directly or indirectly from self-inflicted injuries. For the Accelerated Benefit to be paid, *we* must receive: (1) a completed request for the benefit in a form satisfactory to *us*; and (2) satisfactory proof that the *insured* has a Terminal Illness.

Only one Accelerated Benefit is payable for this Certificate while the *insured* is insured under the *policy* whether insurance is continuous or interrupted. Receipt of the Accelerated Benefit may be taxable. The *owner* is advised to consult with a personal tax advisor to determine the tax impact.

**DEATH BENEFIT**

The Death Benefit is payable when the *insured* dies and after *we* receive satisfactory proof of the *insured*'s death.

**WHAT BENEFIT IS PAYABLE**

The benefit payable is as follows:

1. **Accelerated Benefit:** Except as stated below, 50% of the Amount of Insurance in force on the *insured*'s life, less 50% of the *loan balance* on the date *we* approve the *owner*'s request for the Accelerated Benefit. The benefit will be paid in a lump sum. Upon payment of the Accelerated Benefit, the Amount of Insurance, cash value and any *loan balance* will be reduced by 50%. Future *premiums* will be based on the reduced Amount of Insurance.

2. **Death Benefit:** Except as stated below, the Amount of Insurance in force on the *insured* on the date of the *insured*'s death less any *loan balance* and, if death occurs during the *grace period*, less any *premium* due and not paid.

At *attained age* 85, the Amount of Insurance will increase by 30%. Subject to the Premium section on the Schedule Page, the *premium* for this coverage will not increase at *attained age* 85.

AA-75

GMR-L/AB

**MAXIMUM** - Amounts of insurance under this *policy* are not subject to the Maximum provision of other policies issued to the Policyholder by *us* which limit the total Amount of Insurance of AARP Group coverage for the *insured*.

**SUICIDE** - If the *insured* dies within the first two years insurance is in force and the death is due to, related to or occurs during: suicide, an attempt at suicide or an intentional self-inflicted injury; *we* will only return the *premiums* paid for insurance. If insurance ends, and is reinstated, this Suicide provision will be measured from the reinstatement date, and not from the original *insurance date*. If this Certificate is issued from exercising the "Option to Exchange" provision of another certificate issued by *us* this Suicide provision will be measured from the original certificate's *insurance date*, or reinstatement date, that is being exchanged.

**BENEFICIARY**

Beneficiary(ies) are classed as first, second and so on. Unless otherwise provided in the beneficiary designation, the benefits will be paid as follows:

1.  The Accelerated Benefit will be paid to the *owner,* except if *we* have received satisfactory proof of the *insured*'s death before such payment is made, then the Death Benefit will be paid as stated below.

2.  The Death Benefit will be paid in equal shares to the first beneficiary(ies) who survives the *insured* by 15 days. If no first beneficiary(ies) so survives, payment will be made in equal shares to any second beneficiary(ies) who survives the *insured* by 15 days, and so on. Surviving beneficiary(ies) in the same class will have an equal share in the proceeds otherwise designated for a deceased beneficiary in that class. If no beneficiary is designated or no beneficiary survives the *insured,* the benefit will be payable to the *insured*'s estate, or at *our* option to the *insured*'s surviving relative(s) in the following order of survival: spouse or domestic partner as defined by law, as applicable; children equally; parents equally; or brothers and sisters equally.

**FACILITY OF PAYMENT** - *We* have the right to pay up to $250 of the benefit to anyone who has incurred expenses for the *insured*'s fatal illness or burial. If a payee is a minor or is, in *our* opinion, not legally able to give a valid receipt for any payment due him or her, payment may be made in monthly installments of up to $50 each to any person or institution who, in *our* opinion, is caring for or supporting such payee. These monthly installments will continue until the earlier of the date: (a) claim is made by a duly appointed guardian or committee of the payee for the remainder of the benefit, if any; or (b) the full benefit, to which such payee is entitled, has been paid. Such payment will be proper to the extent made.

**FORFEITURE OF PAYMENT** - No payment will be made to any person(s) if such person(s) is the principal or an accomplice in willfully bringing about the *insured*'s death. Payments will be made in accordance with this section as though that person(s) had died before the *insured*.

**REQUEST PROCEDURE**

To: (a) designate a beneficiary or change a beneficiary designation; and/or (b) transfer ownership; *we* must be given a completed request from the *owner* in a form satisfactory to *us*. Such request must be approved and recorded by *us*. After such recording, the request will take effect as of the date it was signed, subject to any payment made or any other action taken by *us* before the recording.

**TRANSFER OF OWNERSHIP**

The *owner* can transfer all or any part of incidents of ownership of the insurance. Any incidents of ownership so transferred shall be transferred on the date the transfer becomes effective.

AA-75

GMR-L/AB

**LOAN BENEFIT**

Subject to the Deferral Of Payment section on the Important Notice page(s), the *owner* can obtain a loan from *us* on the security of the *cash value*, if: (a) the *owner* gives *us* a completed request in a form satisfactory to *us*; and (b) the loan plus any existing *loan balance* does not exceed 90% of the *cash value.*

The effective annual rate of interest on a loan is 8%. The accrued interest on loan principal is due on each *anniversary date* following the date of the loan, except that: No interest will accrue on or after the date the *owner* requests to surrender the insurance as stated in the Surrender Benefit section. If such accrued interest is not paid within 31 days after such *anniversary date*, it will be added to and become a part of the loan principal as of such *anniversary date.*

The *owner* can repay all or any part of a loan at any time. Failure to repay the loan or the accrued interest on the loan principal will not end insurance, except that: we will give notice to the *owner* if on any *anniversary date* the *loan balance* equals or exceeds the *cash value*. If within 31 days after the date of such notice, the *owner* has not reduced the *loan balance* to an amount less than the *cash value*, insurance will end.

**SURRENDER BENEFIT**

Subject to the Deferral Of Payment section on the Important Notice page(s), the *owner* can surrender all of the insurance and receive the *cash surrender value*, if: (a) the *owner* gives *us* a completed request in a form satisfactory to *us*; and (b) the *insured* is alive on the date of surrender. All insurance will end as of the date of surrender. The date of surrender is the date *we* receive the *owner*'s request for surrender.

AA-75

GMR-L/AB

---

# WHEN INSURANCE ENDS

Except as stated in the Waiver of Premium Benefit for Nursing Home Confinement and Non-Forfeiture Values section, the insurance will end on the earlier of:

1. prior to *age* 95, the last day of the *insurance period* for which the last *premium* has been paid, except that insurance will not end if the *premium* is paid within the *grace period*; or

2. the date insurance ends as stated in the Loan Benefit or Surrender Benefit sections on the Group Permanent Life Insurance page(s).

AA-75

GMR-ENDS

## WAIVER OF PREMIUM BENEFIT
## FOR NURSING HOME CONFINEMENT

*We* will continue the insurance without the payment of *premiums*, if:

1. the *insured* is confined in a *nursing home* at the explicit direction of a physician;

2. the *insured*'s confinement in the *nursing home* has lasted for at least 180 consecutive days;

3. *we* receive satisfactory proof that the *insured* has been so confined. Such proof must be received by *us* within one year after the date such confinement began, except if it is not possible to give such proof within one year after such date, then proof must be given as soon as reasonably possible. Further proof that the *insured* is confined in a *nursing home* must be provided each year thereafter; and

4. *we* approve the benefit.

The Amount of Insurance continued under this benefit is equal to the Amount of Insurance in force on the date the *insured*'s *nursing home* confinement began.

*We* will waive the payment of *premiums* due on the *premium due date* following the date the *insured* has been confined in the *nursing home* for 180 consecutive days. Payment of *premiums* should continue until *we* approve the benefit.

The benefit will end on the earliest of the date:

1. the *insured* is no longer confined in a *nursing home*;

2. confinement in the *nursing home* is no longer at the explicit direction of a physician;

3. *we* do not receive the required proof that the *insured* remains so confined;

4. no more *premiums* are payable; or

5. insurance ends as stated in the Loan Benefit or Surrender Benefit sections on the Group Permanent Life Insurance page(s).

Insurance in force on the date the benefit ends will continue, except as stated on the When Insurance Ends section.

AA-75

GMR-L/DL C

---

## NON-FORFEITURE VALUES

**OPTIONS WHEN INSURANCE ENDS**    If insurance ends and it has no *cash surrender value* there are no options available. If insurance has *cash surrender value* when it ends, the *owner* can elect to surrender the insurance for its *cash surrender value* or the insurance will continue as extended term insurance; in accordance with the following:.

**SURRENDER FOR CASH**    Subject to the Deferral Of Payment section on the Important Notice page(s), the *owner* can surrender all of the insurance for its *cash surrender value*. To do so, the *owner* must: (a) make a request in a form satisfactory to *us*, no later than 3 months after the date insurance ends; and (b) relinquish the Certificate. All insurance will end on the date of surrender. The date of surrender is the date *we* receive the *owner*'s written request for surrender.

AA-75

GMR-NFV

**EXTENDED TERM INSURANCE**

If the insurance has *cash surrender value* when it ends and the *owner* has not elected to surrender the insurance for its *cash surrender value*, the insurance will continue as extended term insurance. No more *premiums* are due for this insurance. It is payable to the beneficiary when *we* have proof that the *insured* died while this extended term insurance was in effect.

The amount of extended term insurance is the amount of insurance in force immediately prior to the time the insurance has ended, less any *loan balance*. Subject to the other conditions in the "What Benefit Is Payable" section on the Group Permanent Life Insurance page(s), the death benefit payable is the amount of extended term insurance. The length of time the extended term insurance will continue in force is the time stated in the Table of Values on the Schedule page. The length of time is calculated on the basis of: (a) the *insured's age at issue*; and (b) the period of time such insurance was continuously in force under the *policy*. The calculation is made by applying the *cash surrender value* at the net single premium rate. After this extended term insurance goes into effect, the Loan Benefit and benefits from riders, the Waiver Of Premium For Nursing Home Confinement, or from an Accelerated Benefit will not be provided.

Subject to the Deferral Of Payment section on the Important Notice page(s), the *owner* can surrender the extended term insurance for its *cash surrender value*. At the time of surrender, the *cash surrender value* will be equal to the net single premium for the time remaining for the extended term insurance.

AA-75

GMR-NFV

---

# DEFINITIONS

**AGE**

The *insured's age at issue* plus the number of complete years from the *insurance date*.

**AGE AT ISSUE**

The *insured's* attained age on the date that the Enrollment Form was signed; or, if this Certificate was issued as an exchange from another Certificate, *age at issue* will be determined in accordance with any applicable provisions of the Certificate being exchanged.

**ANNIVERSARY DATE**

The annual reoccurrence of the *insurance date*.

**CASH VALUE**

The amount stated for selected years in the Table Of Values on the Schedule page(s). Straight line interpolation will determine the *cash value* at times between Anniversaries. The amount is calculated on the basis of: (a) the *insured's age at issue*; and (b) the period of time such insurance was continuously in force under the *policy*.

**CASH SURRENDER VALUE**

The amount of *cash value* less any *loan balance*.

AA-75

GMR-DEF

11

| | |
|---|---|
| **ELIGIBLE MEMBER** | A person who is: (a) a member of AARP; (b) between *age* 45 and *age* 80, inclusive; and (c) a legal resident of the fifty states of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, or Guam; or a person who is insured under another Group Life Insurance policy issued by *us* to the Policyholder, when the *owner* exercises the "Option To Buy" or "Option To Exchange Insurance" section of said other group policy. |
| **GRACE PERIOD** | The 31 day period that begins on any *premium due date* if the *premium* due on such date is not yet paid.  During the *grace period*, the insurance will be continued. However, if the *premium* due on the *premium due date* is not paid by the end of the *grace period*, insurance will lapse and end, except as stated in the Non-Forfeiture Values provision. |
| **INSURANCE DATE** | The date that insurance under the *policy* takes effect, subject to the initial *premium* being paid. |
| **INSURANCE PERIOD** | The span of time from a *premium due date* through the day before the next *premium due date*, during which insurance continues, if the *premium* for such span of time is paid. |
| **INSURED** | The person who: (a) was an *eligible member* on the *insurance date*; (b) became *insured* under the *policy*, as approved by *us*; and (c) remains *insured* under the *policy*. |
| **LOAN BALANCE** | The sum of all unpaid loans increased by accrued interest on a daily basis. |
| **NURSING HOME** | A facility that: (a) is operated pursuant to law; (b) is approved for payment of Medicare benefits or qualified to receive such approval, if so requested; (c) is primarily engaged in providing, aside from room and board accommodation, skilled nursing care under the supervision of a duly licensed physician; (d) provides continuous 24-hours-a-day nursing service by or under the supervision of a registered professional nurse (R.N.); and (e) maintains a daily medical record of each patient. |
| | *Nursing home* does not include a home or facility: (a) used primarily for rest; (b) for the care of drug addicts or alcoholics; (c) for the care and treatment of mental diseases or disorders; or (d) for custodial care. |
| **OWNER** | The person who has all rights of ownership for the insurance.  Unless otherwise stipulated, on the *insurance date* the *owner* will be the *insured*. |
| **POLICY** | The Group Policy, as shown on the face page of this Certificate, issued to the Policyholder by *us*. |
| **PREMIUM** | The applicable full periodic payment toward the insurance coverage, which must be paid for insurance to take effect on the *insurance date* and/or for insurance to continue in force under the *policy*. *Premium* is due on each *premium due date*. |
| **PREMIUM DUE DATE** | The following dates by which the *premium* must be received: (a) initially the *insurance date*; (b) thereafter, until *age* 95, based upon the mode of payment elected by the *owner* and approved by *us*, the annual, semiannual, quarterly or monthly reoccurrence of the *insurance date*. |
| **WE, OUR, US** | New York Life Insurance Company. |

AA-75

GMR-DEF

[X] I'm already an AARP member. 3076788201    [ ] I want to become an AARP member. I understand I will be billed $16.00 for a full year of membership.

# MEMBER ENROLLMENT FORM
*Request for Group Insurance  •  AARP Permanent Life*

**AARP** | Life Insurance Program from 

New York Life Insurance Company
5505 West Cypress
Tampa, FL 33607-1707

0116968484

## STEP 1   MEMBER ENROLLMENT

First Name: Joseph    Middle: E

Last Name: Fitzpatrick

Address: 242 Iceplant Rd

City: Estancia   State: NM   Zip: 87016

Social Security No: ▮▮▮▮

Date of Birth: ▮▮▮▮   Gender: [X] Male [ ] Female

Current Height: 5 Feet 7 Inches    Current Weight: 172 Pounds

In the past 12 months, have you used tobacco or nicotine in any form? [ ] Yes [X] No

**Coverage Amount Requested**
[X] $5,000   [ ] $10,000   [ ] $15,000
[ ] $25,000   [ ] $50,000   [ ] Other:

Daytime Phone #: 505   384 - 5150

Email Address:

**Beneficiary** (List who you would want to receive the benefit. If more than one beneficiary is listed, the benefit will be divided equally unless you indicate a percentage share.)

Beneficiary Name: Paul M Aragom

Relationship to You: Partner   Share: 100%

Beneficiary Name:

Relationship to You:   Share:

## STEP 2   PAYMENT OPTIONS

1. [ ] **Send no money now. Payment will be billed monthly.**

2. [X] **I want premiums to be deducted from my bank account each month.**

Account Holder: Joseph Fitzpatrick   Routing Number ▮▮▮▮   Account Number: ▮▮▮▮

I authorize New York Life to deduct premiums from my account.

X   Joseph Fitzpatrick     01 / 10 / 2019

**AUTHORIZATION ELECTRONICALLY SIGNED** Applicant (Account Holder) Signature     Date

## STEP 3 — STATEMENT OF HEALTH

**Applicant MUST check YES or NO for all 3 questions.  Note: A YES answer may not automatically disqualify you.**

**1.** In the past 3 months, have you consulted a medical professional or had treatment, medication or diagnostic tests of any type?
(Note: You are not required to report negative AIDS or HIV tests.)............................................................... ☒ YES ☐ NO

**2.** In the past 2 years, for any condition, have you been admitted to or confined in a hospital,
nursing home, extended care or special treatment facility?.......................................................................... ☒ YES ☐ NO

**3.** In the past 2 years, have you had treatment or medication for, or been diagnosed by a medical
professional as having any of the following? If you check YES, please check the conditions below: ................. ☐ YES ☒ NO

☐ Stroke   ☐ Cancer   ☐ Diabetes Requiring Insulin   ☐ Immune System Disorder   ☐ Drug or Alcohol Abuse

☐ Lung Condition   ☐ Liver Condition   ☐ Kidney Condition   ☐ Heart Condition   ☐ HIV or AIDS

**Please supply full details for health questions answered "Yes." List condition(s) and date(s) of onset below, along with types of treatment, medicine and dosage.**
**DETAILS:**

| |
|---|
| 20060110 | depression | Selibex |  20160110 | Pain | Baclafin | 20mg PRN 20060110 | PTSD | Symbolta |  20040110 | Acid Reflux | ometrzaole | 40mg |
| Nov 2018 - urinary tract infection in hospital for 10 days. |

## STEP 4 — READ AND SIGN BELOW

Is the insurance applied for intended to replace, discontinue or change any existing insurance or annuity? ............. ☐ YES   ☒ NO

The information on this form is true and complete to the best of my knowledge and belief.  False or incomplete answers may cause benefits to be denied within the first two years.  I understand AARP membership is needed for coverage eligibility. If I am approved, this life insurance will begin on the Insurance Date shown on my Certificate, provided I pay my premiums when due.  Paying a premium before the Insurance Date does not mean coverage is in force.  I will promptly notify New York Life ("NYL") in writing if there are changes in my health before the Insurance Date that would cause me to provide different answers to the health questions on this application.  Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. Any attempt to defraud NYL may also result in a loss of coverage.

**X** Joseph E Fitzpatrick                                              01 / 10 / 2019

**APPLICATION ELECTRONICALLY SIGNED**                        Date

Form GPA-A8.2(1)                                3D0I3G          2 of 2   3111-01-NAT

THIS CONCLUDES THE CERTIFICATE.

# New York Life is here to help.

For your convenience, you can easily manage your Contract information, make important changes or updates, and make premium payments online. Just visit **nylaarp.com/service** to:

- Provide a change of address
- Update or change beneficiary information
- Change the way you choose to be billed
- Make a one-time payment
- Set up automatic payments

📞 **To speak with a knowledgeable New York Life customer service agent, call our award-winning Sales and Service Center at 1-800-260-8865.**
Representatives are available from 8 a.m. to 8 p.m. Monday through Friday, and 9 a.m. to 5 p.m. Saturday (ET).

> To notify us of a life insurance claim, please call toll-free: 1-800-260-8865.





**AARP** | Life Insurance Program from  NEW YORK LIFE

February 4, 2019

AARP Life Insurance Program
New York Life Insurance Company
P.O. Box 30712
Tampa, FL 33630-3712
(800) 695-5164
**nylaarp.com/service**

Joseph Fitzpatrick
242 Iceplant Rd
Estancia NM  87016-6735

## Keeping your insurance information up to date?
## We're with you all the way.

Dear Joseph Fitzpatrick:

Here is confirmation of the recent update to your contract number A10318872. As a reminder, the information that changed is below:

Your new insurance date – also called your effective date – is now 03/07/2019. A two-year contestability period for your contract will also begin on that date.

Now just keep an eye out in the mail for a large white envelope with the AARP Life Insurance Program logo. That will have your new certificate page for your records, and will reflect this change. Also, your next premium payment will be due on 03/07/2019.

It's our pleasure to serve you. Don't forget, for your convenience, you can always manage your contract, request forms, make a payment, or sign up for automatic withdrawals from your checking account online at **nylaarp.com/service.**

As always, thank you for trusting New York Life with your life insurance needs.

Sincerely,

Customer Experience Team
AARP Life Insurance Program
New York Life Insurance Company





**New York Life Insurance Company**
AARP Operations
5505 West Cypress, Tampa, FL 33607

Mr. Joseph Fitzpatrick
242 Iceplant Rd
Estancia, NM  87016-6735

February 4, 2019

**Re:  AARP Life Insurance Program Contract Number: A10318872**

Dear Mr. Joseph Fitzpatrick,

Thank you for being a valued customer.  This confirms a change to your life insurance contract.  Enclosed is a new contract Face Page reflecting the change(s).

Please review all of the information and attach your new contract Face Page to your existing contract as verification of the change(s). New York Life recommends that you keep your insurance documents in a safe place.

If you have any questions or need additional assistance, please call us toll free at 1-800-260-8865.  Representatives are available 8 a.m. to 8 p.m. (Eastern Time) Monday through Friday, or 9 a.m. to 5 p.m. Saturday or contact us online at www.nylaarp.com.

Sincerely,
Member Services
Enclosure

Note: As a reminder, if you ever need to change or update your beneficiary information, please call our Customer Service Department for assistance at the toll free number listed above. Keeping this information up to date ensures we can contact your beneficiaries quickly in the event of a claim.





**New York Life Insurance Company**
51 Madison Avenue, New York, NY 10010

# CERTIFICATE

**AARP PERMANENT LIFE**
**(GROUP PERMANENT LIFE INSURANCE)**
**(Paid Up At *Age* 95)**

**Please note: Defined terms are in *italics* and can be found on the definitions page[s].**

| | |
|---|---|
| **POLICYHOLDER** | TRUSTEE OF THE AARP LIFE INSURANCE TRUST |
| **POLICY NUMBER** | AA-75 (the "*policy*") |

*We* certify that the *insured* becomes insured on 03/07/2019 if the initial *premium* is paid no later than 31 days after 03/07/2019. Insurance is subject to: (a) the Suicide limitation; (b) the terms and conditions of the *policy;* and (c) *our* underwriting requirements.

## INDIVIDUAL SCHEDULE OF BENEFITS

| | |
|---|---|
| **CERTIFICATE NUMBER** | A10318872 |
| **INSURED MEMBER** | Joseph Fitzpatrick |
| **ADDRESS** | 242 Iceplant Rd |
| | Estancia, NM 87016 |
| **DATE OF BIRTH** | ███████ |
| **AGE AT ISSUE** | 70 |
| **SEX** | Male |
| **INSURANCE DATE** | 03/07/2019 |
| **AMOUNT OF INSURANCE** | $5,000 |
| **AT ATTAINED AGE 85** | $6,500 |
| **PREMIUM** | $36.51 monthly – Automatic *Premium* Payment(APP) |
| **CLASS OF RISK** | Non Smoker |
| **BENEFICIARY** | First Beneficiary – Paul M Aragom 100% |
| **RIGHT TO EXAMINE THE CERTIFICATE FOR 30 DAYS** | The *owner* will have 30 days from the date of receipt to examine the Certificate. If the *owner* does not wish to keep the Certificate, it must be surrendered to *us*, or to the agent through whom it was purchased if applicable, within this period. Upon such surrender, *we* will return any *premium* paid and insurance will be void from the start. |

This Certificate replaces all Certificates previously issued under the above Certificate Number.

Secretary                    President

## SCHEDULE

### PREMIUM

The *premiums* are payable to *age* 95 and are guaranteed not to change. Once the required *premiums* are paid, insurance becomes fully paid up. No further *premiums* are required to remain insured under the *policy*.

If the *owner* changes the payment method or frequency the *premium* will change according to the rules on the *insurance date*, as described in the *policy*.

## TABLE OF VALUES

### AGE AT ISSUE: 70

### SEX: Male

| At the Anniversary of the *Insurance Date* | *Cash Value* Per Unit | Length of Extended Term Insurance Available | |
|---|---|---|---|
| | | Years | Days |
| 1 | $0.00 | 0 | 0 |
| 2 | 26.28 | 1 | 187 |
| 3 | 70.59 | 3 | 149 |
| 4 | 115.60 | 4 | 297 |
| 5 | 161.33 | 5 | 322 |
| 6 | 207.84 | 6 | 256 |
| 7 | 255.27 | 7 | 120 |
| 8 | 303.74 | 7 | 228 |
| 9 | 353.43 | 7 | 247 |
| 10 | 404.47 | 7 | 241 |
| 11 | 457.09 | 7 | 215 |
| 12 | 511.62 | 7 | 173 |
| 13 | 568.60 | 7 | 121 |
| 14 | 628.72 | 7 | 60 |
| 15 | 693.01 | 6 | 360 |
| 16 | 734.07 | 6 | 303 |
| 17 | 773.88 | 6 | 249 |
| 18 | 812.38 | 6 | 204 |
| 19 | 849.77 | 6 | 170 |
| 20 | 886.63 | 6 | 153 |

The Amount of Insurance for each unit in this table is $1,000; it becomes $1,300 at attained *age* 85.

This table assumes that the required *premiums* have been paid to the Anniversary shown and an Accelerated Benefit has not been paid and a loan is not outstanding. *Cash values* and Extended Term Insurance amounts at times not shown or where an Accelerated Benefit has been paid or where a loan is outstanding will be furnished upon request. At *age* 105, *we* will send a notice to the *owner* stating that the cash value equals the Amount of Insurance.

A $12 annual fee is added to monthly non-Automatic Premium Payments, translating to an additional $1 per monthly payment. Automatic Premium Payments (APP) are monthly automatic deductions from an authorized bank account.

The *premiums* are based on the billing mode and method on the *insurance date*. Any change to the billing mode or method may cause a change in the *premium*.

AA-75

GMR-S




**Insured:** Joseph Fitzpatrick                                    January 28, 2019

**Life Insurance Beneficiary Information for Contract Number A10318872**

The beneficiary information you provided on your life insurance application is recorded as indicated below.
<u>Please complete the information in each field for all beneficiaries listed.</u> Then sign and return this form in the
postage-paid envelope provided.

**To update your beneficiary information online, visit nylaarp.com/service.**

If you have any questions or need assistance, please call toll free at 1-888-890-8967. Representatives are available
8 a.m. to 8 p.m. Monday through Friday, or 9 a.m. to 5 p.m. Saturday (Eastern Time). Thank you.

**Beneficiary Information Form** - Please provide all information for your designated beneficiaries below.

| Paul M Aragom | Partner | 100.00% | First |
|---|---|---|---|
| Name | Relationship | Share | Class |

242 W. ICEPLANT RD    ESTANCIA N-M 87016
Address (Street, City, State, Zip)

505 384 5750
Phone No

X _Joseph Fitzpatrick_                    2/4/2019
Signature of Owner,  Joseph Fitzpatrick          **Current Date**





April 5, 2019

AARP Life Insurance Program
New York Life Insurance Company
P.O. Box 30712
Tampa, FL 33630-3712
(800) 695-5164
**nylaarp.com/service**

Joseph Fitzpatrick
242 Iceplant Rd
Estancia NM  87016-6735

# Keeping your insurance information up to date?
# We're with you all the way.

Dear Joseph Fitzpatrick:

Here is confirmation of the recent update to your contract number A10318872. As a reminder, the information that changed is below:

* the phone number and/or address on record

If you didn't request this update, please call us right away at (800) 695-5164.  Representatives are available Monday through Friday from 8 a.m. to 8 p.m. and Saturday from 9 a.m. to 5 p.m. (Eastern Time).

It's our pleasure to serve you. And don't forget, for your convenience, you can always manage your contract, make a payment, or sign up for automatic withdrawals from your checking account online at **nylaarp.com/service.**

As always, thank you for trusting New York Life with your life insurance needs.

Sincerely,

Customer Experience Team
AARP Life Insurance Program
New York Life Insurance Company



**AARP**® Life Insurance Program from NEW YORK LIFE

New York Life Insurance Company
**AARP Operations**
Member Services
P.O. Box 30712
Tampa, FL 33630-3712
1-800-695-5164

April 16, 2019

Joseph Fitzpatrick
242 Iceplant Rd
Estancia NM  87016-6735

**Re:  AARP Life Insurance Program Contract Number A10318872**
 **Insured:   Joseph Fitzpatrick**
 **Owner:    Joseph Fitzpatrick**

Dear Joseph Fitzpatrick:

Thank you for contacting us concerning the life insurance contract for Joseph Fitzpatrick.

The following information is being provided as a result of this request:

| | |
|---|---|
| Product: | Permanent Life |
| Face Amount: | $5,000 |
| Effective Date: | March 7, 2019 |
| Status: | Inforce |
| Cash Value Accumulations: | $0.00 as of April 16, 2019 |
| Dividends: | $0.00 |
| Premium: | $36.51 Monthly |
| Outstanding Loan & Interest: | $0.00 |
| Cash Surrender Value: | $26.77 as of April 16, 2019 (may include unearned premium) |

If you have any questions or need additional assistance, please call us toll free at **1-800-695-5164**. Representatives are available 8 a.m. to 8 p.m. (Eastern Time) Monday through Friday, or 9 a.m. to 5 p.m. Saturday or contact us online at www.nylaarp.com.

Sincerely,
Member Services

Note: If you have any other insurance products with New York Life or its affiliates and you wish to make a similar request, please contact your New York Life Agent or Service Center.

EXHIBIT B

# Incident Report
# #TCSO21120023



**TORRANCE COUNTY SHERIFF'S OFFICE**
903 N. 5TH STREET
P.O. BOX 498
ESTANCIA, NM 87016
505.544.4900

## Event Info

| Date Reported | Time Reported | Time Dispatched | Time Arrived | Time Completed |
|---|---|---|---|---|
| 12/08/2021 | 20:08 | 20:09 | 20:18 | 13:07 |

| Addr. of Occ. | State | County | City | Zipcode |
|---|---|---|---|---|
| 242 W. ICE PLANT RD | NM | TORRANCE COUNTY | MCINTOSH | 87032 |

| Date Occ. Range | District | How Reported | Dispatch Disposition |
|---|---|---|---|
| 12/08/2021 - 12/08/2021 | TORRANCE | 911 | RPT |

## Classification Completed

| Class | Subclass |
|---|---|
| HOMICIDE | Homicide, Negligent Manslaughter Other |

## Suspect

| Name Type | Name | Address | City | State |
|---|---|---|---|---|
| Suspect | ARAGON, PAUL M | 242 W. ICE PLANT RD | MCINTOSH | NM |

| Zip | DOB | Sex | Race | EO | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| 87032 | 04/18/1980 | M | WHITE | HISPANIC | 501 | 114 | HAZ |

## Victim

| Name Type | Name | Address | City |
|---|---|---|---|
| Victim | FITZPATRICK, JOSEPH E | 242 W. ICE PLANT RD | MCINTOSH |

| State | Zip | Sex | Race | EO | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| NM | 87032 | M | WHITE | NON-HISPANIC | 508 | 195 | BLU |

**Residential Phone**
(505) 384-5150

## Field contact

| Name Type | Name | Address | City |
|---|---|---|---|
| Field contact | ARAGON, LAWRENCE J | 242 W. ICE PLANT RD | MCINTOSH |

| State | Zip | Sex | Race | EO | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| NM | 87032 | M | WHITE | HISPANIC | 501 | 144 | BRO |

## Mentioned

| Name Type | Name | Address | City |
|---|---|---|---|
| Mentioned | FITZPATRICK, JOSEPH E, III | 3407 70TH COURT EAST | PALMETTO |

| State | Zip | DOB | Sex | Race | EO | Cell Phone |
|---|---|---|---|---|---|---|
| FL | 34221 | 05/02/1970 | M | WHITE | NON-HISPANIC | (941) 737-8906 |

**Residential Phone**
(941) 527-6159

## Narrative

| Written By | Date Written |
|---|---|
| BALLARD, KENT | 12/12/2021 |

On **December 8, 2021**, at approximately **8:08 PM**, Torrance County Sheriff's Office ("TCSO") deputies were

1/12

dispatched to 242 W. Ice Plant Road (McIntosh, NM) in reference to a shooting. Dispatch had received a 9-1-1 call from PAUL M. ARAGON (DOB – 04-18-1980) in which he advised that he had "accidentally" shot "Joe" with a semiautomatic .40 caliber Glock pistol.

TCSO Deputy Pablo Arreola, TCSO Deputy Reese Swatsworth, TCSO Deputy Cesar Quintana, TCSO Deputy Matthew Martinez, and TCSO Deputy Monica Torres all responded to the call for service. Shortly after arriving at the property, TCSO deputies were able to safely contact and detain ARAGON.

Deputies then entered the house to clear it for any additional threats and to check the condition of the victim. Inside the home deputies located a deceased male with what appeared to be a single gunshot wound to the facial area. Based upon information provided by ARAGON and previous call history at that address, the victim was tentatively identified as Mr. Joseph E. Fitzpatrick (DOB – 04-10-1948). Deputies conducted a safety sweep of the residence and the remainder of the property to ensure that there were no additional threats or victims. While clearing the rest of the property, TCSO deputies located a male identified as Lawrence Aragon (DOB – 12-30-1955) in a detached workshop that had been converted into a living space. Still unsure of what had occurred, TCSO deputies detained Lawrence Aragon pending further investigation.

After securing the scene, deputies called medical personnel up to the house. TCSO Deputy Arreola took Nelson Dominguez (Paramedic, Superior Ambulance) back into the house to confirm that Mr. Fitzpatrick was beyond any medical help. After confirming that Mr. Fitzpatrick was indeed deceased, the deputies pulled everyone off the scene in preparation for a search warrant.

During this time, I received a telephone call from the Torrance County Dispatch Center advising me of the call and requesting that I respond to the scene.

While I was en route, I contacted New Mexico State Police ("NMSP") Sergeant Rodger Brunson with the Crime Scene Team ("CST"). I briefed NMSP Sgt. Brunson on the situation and requested assistance in processing the scene once a search warrant could be obtained. I then contacted Deputy District Attorney Ray Sharbutt and advised him on what was transpiring.

I arrived at 242 W. Ice Plant at approximately **9:40 PM**. I was briefed by TCSO Deputy Reese Swatsworth and TCSO Deputy Monica Torres.

After being briefed by the deputies, I called the Honorable District Judge Shannon Murdock to determine whether she would be inclined to authorize a nighttime search based on the circumstances. After being advised by District Judge Murdock that the situation lacked sufficient criteria for a nighttime search, I notified NMSP Sgt. Brunson and arranged for TCSO deputies to continue to maintain the security of the property throughout the night.

Both PAUL ARAGON and Lawrence Aragon were transported from 242 W. Ice Plant back to the Sheriff's Office in Estancia, NM.

At approximately **9:58 PM**, TCSO Deputy Pablo Arreola brought Lawrence Aragon to the TCSO Investigations Office for an interview. I introduced myself and advised Lawrence of his Miranda Warning which he said that he understood and agreed to waive to speak with me. Lawrence confirmed that he lived on the property at 242 W. Ice Plant Road with his son (PAUL ARAGON) and Joseph Fitzpatrick. He said that he lived in Mr. Fitzpatrick's old workshop which he (Lawrence Aragon) was renovating into a living space. Lawrence said that he had lived there for approximately three years while PAUL ARAGON had lived with Mr. Fitzpatrick for approximately six years. According to Lawrence, PAUL ARAGON and Mr. Fitzpatrick were involved in an intimate relationship. After I explained what was going on, Lawrence recalled the events of that evening. He said that earlier that afternoon, he and Mr. Fitzpatrick had gone into Albuquerque to sell some scrap metal at Acme Metals. He said that while they were in Albuquerque they were involved in a minor accident where nobody was injured, but both vehicles were damaged. Lawrence told me that when he and Mr. Fitzpatrick returned to 242 W. Ice Plant Road, they were joined in the garage by PAUL ARAGON and the three men took some "shots" of alcohol. Lawrence stated that after this, he went to his house and laid down. Lawrence recalled that at approximately 8:00 PM, Mr. Fitzpatrick called him on

an integrated intercom system through a pair of cordless phones at the house. He said that Mr. Fitzpatrick was upset saying something about PAUL ARAGON "using meth" again. Lawrence said that he was irritated with Mr. Fitzpatrick for calling him with this and admitted that he was agitated in his response. Lawrence stated that he felt bad for being upset with Mr. Fitzpatrick and called him back on the intercom a few minutes later to apologize and say that they would talk about the issue in the morning. According to Lawrence, he laid back down and was later awakened with TCSO deputies contacted him. Lawrence said that he did not hear or see anything before this and did not know that anything had occurred inside the house. I asked Lawrence about firearms in the house, and he confirmed that Mr. Fitzpatrick had several guns, including handguns, shotguns, and at least one rifle. I asked Lawrence about surveillance camera systems on the property, and he confirmed that both his residence and the main residence shared by Mr. Fitzpatrick and PAUL ARAGON had independent camera systems. He explained that his camera system covered the exterior of his house while Mr. Fitzpatrick's had both interior and exterior cameras. Although Lawrence could not offer a definitive answer, he said that he believed that both systems did record to some type of storage device or service. Lawrence spoke about the fact that PAUL ARAGON was a convicted felon who had been released from prison approximately two years prior. He said that although he did not think that PAUL ARAGON had a "drug problem", he did know him to use methamphetamine recreationally in the past.

After speaking with Lawrence Aragon, I did not believe that there was any information available at that time to suggest that he had committed a criminal act. As such, I asked TCSO Deputy Arreola to give Lawrence a ride back to a neighbor/friend's home where he would be able to stay for the night while the investigation continued.

Later that night, I went back to the Sheriff's Office holding cell area to introduce myself to PAUL ARAGON. I was advised by TCSO Deputy Swatsworth that PAUL ARAGON had what appeared to be dry blood on his hands. When I asked ARAGON about these stains, he confirmed that he was not injured and said that the blood likely came from "Joe." I knew that this type of evidence was both probative and extremely perishable. I decided to take two swabs from ARAGON'S right hand of two of these suspected bloodstains before they could be washed away. While I was obtaining these swabs, ARAGON asked me if I had "watched the video", referring to the surveillance video inside the house where the shooting occurred. I said that I did not.

On **December 9, 2021**, at approximately **12:26 AM**, TCSO Deputy Swatsworth brought PAUL ARAGON to the TCSO Investigations Office for a formal interview. Before the interview began, I advised ARAGON of his Miranda Warning which he said that he understood and agreed to waive to speak with me. ARAGON confirmed that he and Mr. Fitzpatrick had been in an intimate relationship for approximately seven years. He said that he lived with Mr. Fitzpatrick at 242 W. Ice Plant Road for this entire period except for approximately two years in which he was incarcerated for violating the terms of his parole on a prior felony burglary charge. ARAGON said that on this night, he and Mr. Fitzpatrick were inside of the main house together. He stated that they were arguing about money and finances during which he may have commented about "shooting Joe." ARAGON said that he wasn't sure if he said this or not, but if he did, he would have most likely been referring to shooting Mr. Fitzpatrick with a "soft-pellet" gun. ARAGON said that Mr. Fitzpatrick said that he "didn't' have the balls to shoot (him)."

According to ARAGON, Mr. Fitzpatrick picked up a Glock .40 semiautomatic pistol, that he typically kept on the bar dividing the kitchen and dining room and placed it down on the counter in front of him (ARAGON). He said that he picked the gun up and was going to point it toward a window behind Mr. Fitzpatrick. ARAGON admitted that he must've inadvertently had his finger on the trigger of the gun, because it went off, striking Mr. Fitzpatrick in the eye. ARAGON said that Mr. Fitzpatrick immediately slumped forward in the chair. ARAGON told me that he put the gun down and checked Mr. Fitzpatrick for a pulse, saying that this was how he ended up getting Mr. Fitzpatrick's blood on his hand. ARAGON said that after he couldn't find a pulse, he called 9-1-1 and waited for law enforcement to arrive on the scene. He said that when law enforcement arrived, he exited the house and was taken into custody. ARAGON continually mentioned dexterity and numbness problems with his fingers that he said would cause him difficulty in feeling if his finger was on the trigger or even with the act of pulling the trigger itself. ARAGON admitted that he was a convicted felon and had served prison time within the previous ten years for an Attempt to Commit Aggravated Burglary (Case No: D-202-CR-2013-00683). ARAGON knew that this conviction prohibited him from possessing a firearm. I confirmed with ARAGON that there were several active surveillance cameras both inside and outside of the house at 242 W. Ice Plant Road. ARAGON said that he believed that these cameras recorded locally to a storage device inside the house. ARAGON confirmed that he had consumed alcohol in

the hours leading up to the shooting, saying that he recalled having a few shots or sips of "Seagram 7" in the garage with Mr. Fitzpatrick and Lawrence Aragon when it was "still light outside." He said that after that, he had one or two beers inside the house. ARAGON stated that he did not feel as though he was intoxicated and that he understood fully what was going on.

Since ARAGON had admitted to consuming alcohol, I asked TCSO Deputy Swatsworth to see if he (ARAGON) would consent to a breath alcohol test. ARAGON consented, and at 1:48 AM, he submitted to the test which showed a breath alcohol level of .16 g/210 L.

Based upon the information available to be at that time, I completed a Criminal Complaint & Probable Cause Statement for ARAGON charging him with an Open Count of Murder and Felon in Possession of a Firearm. TCSO Deputy Swatsworth transported ARAGON to the CoreCivic Detention Center where he was booked in without incident.

At approximately **6:00 AM**, I drafted an affidavit for a search warrant for the property at 242 W. Ice Plant Road, McIntosh, NM, 87032. This search warrant was approved by Deputy District Attorney Ray Sharbutt and ultimately signed by the Honorable District Judge Shannon Murdock.

I emailed a copy of the signed search warrant to TCSO Deputy Alex Schwerdel who was currently at the scene waiting on NMSP CST personnel to arrive. NMSP Agent Edgar Limas and NMSP Agent Nathan Garcia responded to the scene and began their duties in processing

I arrived back at 242 W. Ice Plant Road at approximately **9:05 AM.** I entered the crime scene at approximately **9:15 AM** for a brief walk-through with NMSP Agent Limas. During this time, I observed what appeared to me to be a functional home security system with two different cameras in the living room area of the residence where the shooting occurred.

During this same time, TCSO Deputy Schwerdel also entered the crime scene to remove Mr. Fitzgerald's dogs who had gotten loose from the night before.

At approximately **10:55 AM**, Investigator K.B. Bynon (Office of the Medical Investigator) arrived on the scene with Hanna Sanchez (Torrance Co. Fire Dept.), Chris Sanchez (Torrance Co. Fire Dept.), and B.J. Travis (Torrance Co. Fire Dept.). These four individuals entered the scene for the purpose of the initial OMI investigation and the removal of the deceased.

At approximately **12:51 PM**, TCSO Lt. John Stocum took possession of the evidence collected by the NMSP CST.

At approximately **1:07 PM**, NMSP CST and TCSO units completed their activities and cleared 242 W. Ice Plant Road. Before leaving, the property was released back to Mr. Lawrence Aragon as he was an established resident.

TCSO Lt. Stocum and I returned to the Sheriff's Office where we logged and transferred the collected evidence into TCSO custody.

That afternoon, I drafted an affidavit for a search warrant requesting permission to access the two recovered digital video recorder (DVR) systems seized from 242 W. Ice Plant Road. This search warrant was approved by Deputy District Attorney Ray Sharbutt and eventually signed by the Honorable District Judge M. Murphy.

End of Narrative

Lt. Kent Ballard
Torrance Co. Sheriff's Office
210

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| SCHWERDEL, ALEXANDER | 12/10/2021 |

On December 8, 2021, at approximately 08:08 PM, Torrance County Sheriff's Office ("TCSO") deputies were dispatched to 242 W. Ice Plant Road (McIntosh, NM) regarding a shooting.

I became aware of the call for service through CAD on my county-issued computer. I contacted TCSO Lieutenant ("Lt.") Kent Ballard via cell phone and asked if I would need to come out to assist with the call for service. I was advised by TCSO Lt. Ballard based on the CAD notes, a suspect was already detained and due to the time, a search warrant authorizing a nighttime search would not be likely. I was advised by TCSO Lt. Kent Ballard to come out the following morning to relieve the on-scene TCSO deputies who were securing the scene for the search warrant.

On December 9, 2021, at approximately 05:36 AM, I arrived at 242 W. Ice Plant Rd and relieved TCSO Deputy Monica Torres. I secured the scene until the search warrant could be executed. At approximately 07:02 AM I received an email from TCSO Lt. Ballard with an attached PDF copy of a signed search warrant. TCSO Deputy Erwin Young secured the scene, while I went and printed a physical copy of the search warrant.

At approximately 08:10 AM, New Mexico State Police ("NMSP") Crime Scene Unit ("CSU") arrived on the scene and were provided a physical copy of the search warrant. NMSP CSU Agent Edgar Limas and NMSP Agent CSU Nathan Garcia began processing the scene.

TCSO Lt. Ballard arrived at approximately 09:05 AM and entered the crime scene at approximately 09:15 AM. At the same time as TCSO Lt. Ballard was doing a walk through with NMSP CSU, I also entered the crime scene to remove the victim Joseph Fitzpatrick's dog who had gotten loose from the previous night.

At approximately 01:07 PM, I cleared the scene along with other units.

On December 10, 2021, at approximately 09:00 AM, I along with TCSO Lt. Ballard attended the autopsy for the victim, Joseph Fitzpatrick.

This concludes my involvement.

Deputy A. Schwerdel.
Torrance Co. Sheriff's Office
Man #294
Special Investigations

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| BALLARD, KENT | 12/12/2021 |

On December 10, 2021, at approximately 9:00 AM, Torrance County Sheriff's Office ("TCSO") Deputy Alex Schwerdel and I arrived at the Office of the Medical Investigator ("OMI") in Albuquerque, NM, for Mr. Fitzpatrick's autopsy. The autopsy (OMI # 2021-09716) was conducted by Aidan P. Kerr, M.D. During the external examination, Dr. Kerr confirmed a single defect just below Mr. Fitzpatrick's left eye. Dr. Kerr further advised that a computed tomography ("CT") scan of Mr. Fitpatrick's body before the external examination determined that there were no retained projectiles.

On December 12, 2021, I was able to identify Joseph Fitzpatrick's son (Daniel Fitzpatrick) using various law enforcement databases. According to this information, Daniel was currently living in Logansport, Indiana. I notified the Torrance County Dispatch Center of this information and asked that they request local law enforcement to

attempt to locate Daniel Fitzgerald to make an in-person death notification. The Torrance County Dispatch Center sent the Administrative Message ("AM") message at 1:44 PM.

Later that evening, I received a telephone call from Cass County (IN) Communications advising that they went to the listed address and were informed that Daniel Fitzpatrick no longer lived there. They gave me a secondary address of 925 Danbury Drive, Kokomo, Indiana. This second address was in Howard County, IN. I notified the Torrance County Dispatch Center of this development and requested a second AM message to be sent.

End of Narrative

Lieutenant K. Ballard
Torrance Co. Sheriff's Office
210

## Supplemental Narrative

**Written By**
SWATSWORTH, REESE

**Date Written**
12/13/2021

On 12/08/2021, I and other deputies responded to a possible gunshot wound at 242 Ice Plant Rd W. The reporting party had called into dispatched stating that he had just shot his roommate on accident. During the initial call, this reporting party informed dispatch that the roommate was already dead and he still had the weapon used on him. Deputies Quintana, Arreola, Martinez, and I met at the end of Ice Plant Rd in order to quickly prepare for the approach of the residence. While here, we decided to take two vehicles with two deputies in each. Since the reporting party still was inside the home possibly armed, we decided to surround the house and attempt call-outs to anyone inside.

As we got to the residence, before call-outs began, I noticed a person looking outside the residence window. This person then put their hands up and started walking out of the house. Once outside, I gave commands to walk down the driveway keeping hands where I can see them the entire time. All deputies gathered around one vehicle at the base of the driveway ready to take the person into custody. The male, later identified as Paul Aragon, was contacted at the end of the driveway then taken into custody. During this time, Paul stated that the only person in the house was "Joe" who was later identified as Joe Fitzpatrick. Joe was allegedly deceased in the home, but Paul's dad (Lawrence Aragon) was in another structure on the property.

Due to the possibility of a person needing medical assistance being in the home, we decided to not continue with call-outs and to make entry into the home. Around this time, Deputy Torres arrived at the scene to assist. She took Paul then placed him into her unit while other deputies gathered into one vehicle to approach the home. When approaching the home, I noticed a male sitting on a barstool with blood covering the front of his shirt. Deputies made entry into the home and performed a safety sweep to ensure there were no other threats in the home. After the sweep was completed, we checked the male who was positively identified as Joe. He had what appeared to be one bullet wound in his left eye and to be deceased. There were two dogs in the home one of which appeared to be aggressive and the other was disturbing the scene. Due to this, deputies decided to clear the remainder of the property then return inside with medical to pronounce Joe and get the dogs out.

When clearing the remainder of the property, we found Lawrence in an outbuilding asleep. He was also detained so that he could be placed into a unit while the investigation was ongoing. After the property was deemed safe, I went back to get the medical personnel who would be entering the home. Deputies took the medic to the house where he confirmed that Joe was deceased. After doing so, The house was closed off to any more people entering and a perimeter was set around the property. I took Lawrence to the Sheriff's office so that he could be interviewed while Deputy Arreola transported Paul. It should be noted that other deputies believed that they saw two people exit the house so Lawrence was through to have possibly had a role in what occurred.

Lawrence was interviewed first by Lt Ballard after being transported to the investigations office by Deputy

Arreola. He was deemed to not be involved and was released taken back to the area of his residence. I stayed with Paul in the office until he was interviewed by Lt Ballard. I transported him to the investigations office then back to the main office after the interview was completed. Lt Ballard drafted a criminal complaint about this incident, and I eventually took Paul to CCA without incident. After dropping him off, I returned to the scene and stayed on the perimeter until relieved by the day shift.

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| MARTINEZ, MATTHEW | 12/13/2021 |

On December 8, 2021, at approximately 8:08 pm, Torrance County Sheriff's Office (TCSO) Deputies were dispatched to 242 W. Ice Plant Road, in reference to a shooting. Prior to Deputies arrival, Dispatch stated a male, who identified himself as Paul Aragon advised he accidentally shot someone. Dispatch stated Paul still had the firearm and was inside of the residence.

Upon Deputies arrival, I gave multiple verbal commands for Paul to walk in our direction with his hands up, via vehicle-mounted Public Address System (PA). Paul stepped out of the residence with his hands up. Paul appeared to be highly intoxicated, having a hard time maintaining his balance as he walked to Deputies. I observed Paul to have Slurred speech as I spoke to him. Once Paul was at the end of the driveway, I placed Paul in hand restraints (detained) until Deputies could safely clear the residence. Paul was placed in the secured portion of a fully marked patrol unit.

Its to be noted, I observed Paul to have blood on his left hand as I was placing hand restraints on him.

Upon clearing the residence, Deputies observed a male, who was later identified as Joseph Fitzpatrick sitting in a chair in the kitchen. Joseph appeared to be lifeless with an apparent gunshot wound to the facial area.

Deputies continued to clear the property for any further threats. Deputies located a male, who was identified as Lawrence Aragon in a detached shed converted to a sleeping area. I observed Lawrence to be laying in a bed with a blanket over him. Deputies were able to safely place Lawrence in investigative detention after multiple verbal commands.

Medical personnel arrived on the scene and entered the home to check on the condition of Joseph. Medical personnel determined Joseph was beyond any medical help.

Deputies set up a perimeter around the residence. Until further instruction from Lieutenant (LT) K. Ballard. I was released from the scene at 4:00 am.

This concludes my involvement in this incident. End of report.

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| BALLARD, KENT | 12/15/2021 |

On **December 13, 2021**, at approximately **8:15 AM**, I executed the search warrant on the NRAN Digital Video Recorder ("DVR") seized from 242 W. Ice Plant Road on December 9th.

Manufacturer: NRAN
Device Name: W-NVR
Device S/N: N6A22758326479
Device Model: K8208-W
Hardware ID: 9013160200
Software Version: 3.0.8.0

I powered up the DVR and immediately noted a significant variation between the system time and the actual time.

To determine this variation, I located a known point on the DVR footage and the same point on Deputy Pablo Arreola's body-worn camera. The time on the body-worn camera is not user-defined and instead uses a server time similar to a cellular phone for a higher degree of accuracy. I found that the DVR system time was approximately 16 hours, 30 minutes, and 5 seconds ahead of the actual time. To avoid confusion, all times listed in this report will be the approximate corrected time which was obtained by subtracting 16h:30m:05s.

I confirmed that at the time the DVR was seized, there were seven (7) camera inputs to the device.

Channel 1 - Exterior camera depicting the front (north) driveway.
Channel 2 - Exterior camera depicting the front (north) driveway.
Channel 3 - Interior camera depicting the living room, kitchen, and dining room.
Channel 4 - Interior camera depicting the living room, kitchen, and dining room.
Channel 5 - Exterior camera depicting the rear (south) side of the residence.
Channel 6 - Exterior camera depicting the rear (east) side of the residence.
Channel 7 - Interior camera depicting the east side of the residence through an interior window.

I viewed the video from the night of the incident and observed the following.

**Corrected Date & Time: 12-08-2021 @ 7:59:29 PM**

Channel 4

Joseph Fitzpatrick and PAUL ARAGON are observed sitting at the kitchen bar. Fitzpatrick is seated behind ARAGON closer to the south wall. The cordless house phone behind Fitzpatrick illuminates suggesting that he received a call or intercom page. Fitzpatrick picks up the cordless house phone and has a brief conversation before disconnecting at approximately 8:00:45 PM.

**Corrected Date & Time: 12-08-2021 @ 8:01:26 PM**

Channel 4

PAUL ARAGON turns around in his chair to face Joseph Fitzpatrick. After what appears to be a very brief verbal exchange, Joseph Fitzpatrick turns around and retrieves what was later to be determined as a Glock Model 27 pistol in a black holster on the shelf behind him. The Glock 27 pistol is a subcompact semiautomatic pistol in .40 caliber S&W. Fitzpatrick appears to hand ARAGON the pistol with his right hand while retaining the black holster in his left hand.

**Corrected Date & Time: 12-08-2021 @ 8:01:45 PM**

Channel 4

PAUL ARAGON raises the Glock 27 pistol and levels it pointed directly at Joseph Fitzpatrick's face. Approximately 3 seconds later, ARAGON pulls the trigger, discharging a single shot from the pistol and striking Fitzpatrick under the left eye. ARAGON then turns around in his stool facing the television on the north wall of the living room.

**Corrected Date & Time: 12-08-2021 @ 8:02:39 PM**

Channel 4

PAUL ARAGON retrieves what appears to be a pipe from the kitchen counter from which he smokes an unknown substance. In the minutes that follow, PAUL ARAGON continues to stay seated at the bar and smoking from the pipe while occasionally looking back several times at Fitzpatrick who is slumped over in the chair and bleeding profusely from the injury to his face. At one point, ARAGON is observed nudging Fitzpatrick's left leg with his foot and receiving no apparent response.

2022-02-10 16:06:28 1_111

**Corrected Date & Time: 12-08-2021 @ 8:07:22 PM**

Channel 4

PAUL ARAGON retrieves what is believed to be the cordless house phone and appears to make a phone call. The time that this occurred appears to be consistent with ARAGON'S call to 9-1-1.

**Corrected Date & Time: 12-08-2021 @ 8:23:06 PM**

Channel 2

The first TCSO units arrive at the property.

**Corrected Date & Time: 12-08-2021 @ 8:24:46 PM**

Channel 2

PAUL ARAGON exits the front door of the residence with his hands above his head before being taken into custody by TCSO deputies.

After reviewing the video footage, I was able to download video segments from Camera 4, Camera 2, and Camera 3 as it appeared to be the footage most probative to this investigation. The DVR will be retained in evidence pending a resolution to this case.

End of Narrative

Lieutenant K. Ballard
Torrance Co. Sheriff's Office
210

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| TORRES, MONICA | 12/16/2021 |

On December 8, 2021, at or about 2000 hours all Torrance County Deputies received a tone out through Torrance County Dispatch Center of a male subject who was shot in the face. The address deputies were requested to was 242 W. Ice Plant Road McIntosh, New Mexico.

I, Deputy Monica Torres of the Torrance County Sheriff's Office, arrived on the scene to find Deputy Swatsworth, Deputy Quintana, Deputy Arreola, and Deputy Martinez briefing to make entry of the residence. Deputy Swatsworth informed me that they had a male subject, identified as Mr. Paul Aragon in the back seat of his patrol

unit. Deputy Swatsworth requested that I remain with Mr. Aragon while the deputies on the scene cleared the residence. Deputy Swatsworth also requested I provide Mr. Aragon with his Miranda Warning, which I did.

I asked Mr. Aragon who was inside the residence and what had occurred. Mr. Aragon stated that he was in an argument with his significant other, identified as Mr. Joseph Fitzpatrick. During the altercation. Mr. Aragon stated he picked up a firearm and attempted to shoot at the window shot Mr. Fitzpatrick in the eye. I observed that Mr. Aragon appeared to be under the influence of alcohol. His eyes were bloodshot and watery and smelled of an alcoholic beverage. I asked him if he had consumed any alcoholic beverages. Mr. Aragon stated, "Every day since I was 10 years old". I asked him if he had used any methamphetamine, and Mr. Aragon stated that meth was the reason he and Mr. Fitzpatrick were arguing.

I initiated a crime scene log for the entry and departure of the scene. The area was sealed off with crime scene tape preventing others from entry. I remained at the scene until 12/9/2021 at 0536 hours. I was relieved by investigations by Deputy Alex Schwerdel.

End of Report
Monica R. Torres, Deputy
Torrance County Sheriff's Office

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| QUINTANA, CESAR | 12/16/2021 |

On December 08, 2021, I responded to 242 W Ice Plant Rd. in Mcintosh NM in reference to a possible gunshot wound (GSW). Torrance County Dispatch (TCD) advised deputies there were two males at the residence and one was possibly deceased inside the residence with a gunshot wound. TCD advised deputies the suspect was still inside the residence with the firearm.

Deputies staged on Highway 41 and Ice Plant Rd. to plan a safe approach to the residence. Deputy M. Martinez, P. Arreola, R. Swatsworth, and I proceeded to the residence and conducted calls out at the intersection of Ice Plant rd and Irving Dr. Deputies came in contact with a male later identified as Paul Aragon, who came out the front door of the residence with his hands in the air. Paul was given loud verbal commands and deputies were able to safely place Paul in handcuffs with no incident. Paul was safely secured in a marked patrol unit.

Deputy M. Torres stayed with Paul as other deputies and I proceeded to clear the residence. When approaching the front door, I observed a male identified as Joseph Fitzpatrick slumped over sitting on a bar stool in the kitchen/dining area. Joseph appeared to have had a gunshot wound to the head and I observed the front of his torso full of blood. I observed blood on the floor at the male's feet. Deputies and I continued clearing the residence and had negative contact with anyone else inside the residence.

Deputies continued clearing the property and proceeded to a shed located just north of the residence. Deputies came in contact with a male later identified as Lawrence Aragon who was laying down in his bed. Lawrence was placed in handcuffs with no incident and secured in a marked patrol unit. Deputies pulled back away from the residence after making it safe and stood by for medical to arrive on the scene.

One of the paramedics was escorted into the residence by me and the other deputies. The paramedic stated Mr. Fitzpatrick was deceased. Deputies were able to remove the dogs from inside the residence with no incident and all law enforcement and medical staff exited the residence. The residence was secured prior to law enforcement leaving the residence.

This concluded my involvement in the matter. Any further information will be added in a supplemental report.

End of Supplemental report

Torrance County Sheriffs Office
Deputy Cesar Quintana
Man #302

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| ARREOLA, PABLO | 12/17/2021 |

### Assignment:

On Wednesday, December 08, 2021, Torrance County Sheriff Deputies responded to 242 W Ice Plant Rd. in McIntosh, NM in a report of a possible gunshot wound. Torrance County Dispatch advised TCSO deputies there were two males at the residence and one was possibly deceased inside the residence with a gunshot wound. Dispatch advised TCSO deputies the suspect was still inside the residence with the firearm.

TCSO Deputies M. Martinez, C. Quintana, R. Swatsworth, and I arrived at the residence near the driveway. Due to the nature of the call, TCSO Deputies performed a high-risk call out using our electronic public announcement (PA) system near the driveway of the residence. TCSO Deputy Martinez gave verbal commands over the PA system for all occupants to exit the residence with their hands up. TCSO Deputies came in contact with a male later identified as Paul Aragon, who came out the front door of the residence with his hands in the air. Paul was given loud verbal commands through the public announcement system and TCSO deputies placed Paul in Hand restraints. Paul was detained and placed in the back of a TCSO marked patrol unit.

Deputy M. Torres stayed with Paul and other TCSO deputies proceeded to conduct a safety sweep of the residence. When approaching the front door, I saw a male (later identified as Joseph Fitzpatrick) slumped over sitting on a bar stool in the dining area. Joseph appeared to have had a gunshot wound, and and I observed blood on his chest area. TCSO Deputies and I continued clearing the residence and secured the inside of the residence. TCSO Deputies continued clearing the property and proceeded to a shed located just north of the residence. TCSO Deputies came in contact with a male (later identified as Lawrence Aragon) who was laying down in his bed. Lawrence was placed in handcuffs with no incident and secured in a patrol unit. TCSO Deputies pulled back away from the residence after it was secured and waited for medical to arrive on the scene.

One of the paramedics was escorted into the residence by Deputy R. Swatsworth, M. Martinez, C. Quintana, and I. The paramedic stated Patrick was deceased. TCSO Deputies were able to remove the dogs from inside the residence with no incident and all law enforcement and medical staff exited the residence. The residence was secured before law enforcement left the residence.

I then transported Paul to the Torrance County Sheriff's Office holding cell. I then took Lawrence from the holding cell to the Special Investigation's Office and Lawrence spoke with TCSO Lt. K. Ballard. I wasn't present for any of the statements that were made by Lawrence to Lt. Ballard. I then gave Lawrence a ride to a residence just East of 242 W. Ice Plant Rd. in McIntosh. I then stayed to help Deputy M. Torres secure the residence until 0400 hours and was relieved by Deputy R. Swatsworth.

This concludes my participation in this matter.

End of Supplemental Report.
Pablo H. Arreola
Sheriff Deputy
Badge #292
Community Resource Team
Torrance County Sheriff's Office

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| BALLARD, KENT | 12/20/2021 |

On **December 20, 2021,** I received a call from Joseph E. Fitzpatrick III. Joseph identified himself as the son of the deceased and said that he had been made aware of the situation by Lawrence Aragon. I provided Joseph with the information available to me at that time as well as contact information for the New Mexico Office of the Medical Investigator ("OMI") and Torrance County Probate Office.

On **December 21, 2021,** I received the OMI Report of Findings regarding Mr. Fitzpatrick's death. The report concluded that the manner of death was "Homicide" with the cause of death was "Gunshot Wound of Head." I did note a typographical error in the report as it stated that the location of the incident was "424 Ice Plant Road" and not 242 W. Ice Plant Road.

End of Narrative

Lieutenant K. Ballard
Torrance Co. Sheriff's Office
210

## Supplemental Narrative

| Written By | Date Written |
|---|---|
| BALLARD, KENT | 01/11/2022 |

On **January 11, 2022,** I received a sealed box from the Office of the Medical Investigator ("OMI") containing items collected during Joseph Fitzpatrick's autopsy. These items were transferred into a different box and logged into secure evidence storage at the Torrance County Sheriff's Office.

End of Narrative

Lt. Kent Ballard
Torrance Co. Sheriff's Office
210

## Case Management

| Initial Investigator | Current Investigator | Report Status | Approved By | Date Approved |
|---|---|---|---|---|
| TORRES, MONICA | BALLARD, KENT | Approved | BALLARD, KENT | 12/23/2021 17:09 |

| Case Status |
|---|
| CLEARED ADULT ARREST |

EXHIBIT C



**New York Life Insurance Company**
**AARP Operations**
Claims Service
P.O. Box 30713
Tampa, FL 33630-3713
1-800-695-5165

February 25, 2022

Joseph Fitzpatrick
3407 70th Court East
Palmettos  FL 34221

Insured: Joseph Fitzpatrick
Claim #: LC-1418000

Dear Joseph Fitzpatrick:

This letter is in reference to the above pending claim.

We have received the copy of the police report. These documents are currently under review.

If you have any questions, please contact us at 1-800 695 5165, between the hours of 8am to 5pm Eastern Standard Time, Monday through Friday.

Sincerely,

*Claims Service*

EXHIBIT D



**New York Life Insurance Company**
**AARP Operations**
Claims Service
P.O. Box 30713
Tampa, FL 33630-3713
1-800-695-5165

May 5, 2022

Paul Aragon
242 W Iceplant Rd
Estancia, NM 87016

Insured: Joseph Fitzpatrick
Claim #: LC-1418000

Dear Paul Aragon:

This letter is in reference to the above pending claim.

We are in receipt of the claim form you submitted online. The claim is currently under review. We will notify you after the review has been completed.

If you have any questions, please contact us at 1-800 695 5165, between the hours of 8am to 5pm Eastern Standard Time, Monday through Friday.

Sincerely,

*Claims Service*

EXHIBIT E

**D-722-CR-202100172 - Tuesday, May 31, 2022**

# State of New Mexico
## v.
## Paul Matthew Aragon

## CASE DETAIL

| CASE # | CURRENT JUDGE | FILING DATE | COURT |
|---|---|---|---|
| D-722-CR-202100172 | Murphy, Mercedes C. | 12/13/2021 | ESTANCIA  District |

## PARTIES TO THIS CASE

| PARTY TYPE | PARTY DESCRIPTION | PARTY # | PARTY NAME |
|---|---|---|---|
| D | Defendant | 1 | ARAGON PAUL MATTHEW |
| | ATTORNEY: RHINEHART KATHLEEN M. | | |
| P | Plaintiff | 1 | STATE OF NEW MEXICO |
| | ATTORNEY: CAMPBELL JOSEPH E. | | |

## CRIMINAL CHARGE DETAIL

| PARTY | COUNT | SEQ # | STATUTE | CHARGE | CLASS | CHARGE DATE | CIT # | PLEA | DISPOSITION | DISP DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| D 1 | 1 | 1 | 30-2-1(A)(1) | MURDER IN THE FIRST DEGREE (WILLFUL & DELIBERATE) | F1 | 12/08/2021 | | | | |
| D 1 | 2 | 1 | 30-7-16(A) (1) & (B) | Receipt, Transportation or Possession of a Firearm or Destructive Device by Certain Persons (Felon) | F3 | 12/08/2021 | | | | |

## HEARINGS FOR THIS CASE

| HEARING DATE | HEARING TIME | HEARING TYPE | HEARING JUDGE | COURT | COURT ROOM |
|---|---|---|---|---|---|
| 09/12/2022 | 9:00 AM | JURY TRIAL | Murphy, Mercedes C. | ESTANCIA | Torrance County Courthouse Courtroom 1 |
| 07/07/2022 | 10:15 AM | Pretrial Conference | Murphy, Mercedes C. | ESTANCIA | Torrance County Courthouse Courtroom 1 |
| 03/03/2022 | 10:20 AM | ARRAIGNMENT | Murphy, Mercedes C. | ESTANCIA | Torrance County Courthouse Courtroom 1 |

## REGISTER OF ACTIONS ACTIVITY

| EVENT DATE | EVENT DESCRIPTION | EVENT RESULT | PARTY TYPE | PARTY # | AMOUNT |
|---|---|---|---|---|---|
| 05/09/2022 | ENTRY OF APPEARANCE | | | | |
| 04/08/2022 | NTC: HEARING (PRETRIAL CONFERENCE) | | | | |
| | NOTICE VACATING AND RE-SETTING PRE-TRIAL CONFERENCE | | | | |
| 03/03/2022 | AUDIO LOG NOTES | | | | |
| | ARRAIGNMENT 3/3/22 | | | | |
| 02/16/2022 | ORD: TO TRANSPORT | | | | |
| | VIRTUAL TRANSPORT ORDER | | | | |
| 02/10/2022 | NTC: HEARING (JURY TRIAL) | | | | |
| | JURY TRIAL | | | | |
| 02/10/2022 | NTC: HEARING (PRETRIAL CONFERENCE) | | | | |
| | PRETRIAL HEARING | | | | |
| 02/10/2022 | NTC: HEARING (ARRAIGNMENT) | | | | |
| | NOTICE OF ARRAIGNMENT | | | | |
| 02/10/2022 | ORD: Bind-Over Order | | | | |
| 02/10/2022 | REQUEST FOR HEARING/ SETTING | | | | |
| 02/10/2022 | WITNESS LIST | | | | |

**D-722-CR-202100172 - Tuesday, May 31, 2022**

| | | | |
|---|---|---|---|
| 02/10/2022 | DEMAND FOR NOTICE | | |
| | Intent to claim not guilty | | |
| 02/10/2022 | DISCOVERY | | |
| | Notice | | |
| 02/10/2022 | CERTIFICATE OF | | |
| | DISCLOSURE OF | | |
| | INFORMATION | | |
| 02/10/2022 | DISCLOSURE | | |
| | Demand | | |
| 02/10/2022 | DEMAND FOR NOTICE | | |
| | Claim Alibi | | |
| 02/10/2022 | CRIMINAL INFORMATION | | |
| | NON-OPEN | | |
| 02/09/2022 | ORD: ORDER | | |
| | ORDER ALLOWING WITNESS TO APPEAR TELEPHONICALLY | | |
| 02/09/2022 | WAIVER | | |
| | of Preliminary Hearing | | |
| 02/09/2022 | MTN: TO APPEAR | | |
| | TELEPHONICALLY | | |
| 01/06/2022 | ORD: TO TRANSPORT | | |
| | TRANSPORT ORDER | | |
| 12/21/2021 | ORD: ORDER | | |
| | ORDER ENLARGING TIME LIMITS | | |
| 12/21/2021 | MTN: MOTION/ PETITION TO | | |
| | EXTEND TIME | | |
| 12/20/2021 | NTC: Hearing (Preliminary) | | |
| | NOTICE OF PRELIMINARY HEARING | | |
| 12/14/2021 | ENTRY OF APPEARANCE | P | 1 |
| 12/13/2021 | JDG: NOTICE OF JUDGE | P | 1 |
| | ASSIGNMENT | | |
| 12/13/2021 | TRANSCRIPT OF | | |
| | PROCEEDINGS | | |
| 12/13/2021 | OPN: CHANGE OF VENUE | | |
| | M-56-FR-2021-162 | | |

## JUDGE ASSIGNMENT HISTORY

| ASSIGNMENT DATE | JUDGE NAME | SEQ # | ASSIGNMENT EVENT DESCRIPTION |
|---|---|---|---|
| 12/13/2021 | Murdock, Shannon | 1 | INITIAL ASSIGNMENT |
| 12/13/2021 | Murphy, Mercedes C. | 2 | Case Consolidation Assignment |